# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PATRICK AYERS, derivatively on behalf of Nominal Defendant FIDELITY NATIONAL FINANCIAL, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2025-0650-LWW |
| WILLIAM P. FOLEY, DOUGLAS K. AMMERMAN, HALIM DHANIDINA, THOMAS M. HAGERTY, DANIEL D. LANE, HEATHER H. MILLER, SANDRA D. MORGAN, JOHN D. ROOD, PETER O. SHEA, JR., and CARY H. THOMPSON, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| FIDELITY NATIONAL FINANCIAL, INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

## OPINION

Date Submitted: March 9, 2026
Date Decided: June 15, 2026

Stephen E. Jenkins & Tiffany Geyer Lydon, ASHBY & GEDDES, P.A., Wilmington, Delaware; Gregory Mark Nespole, Daniel Tepper, & Cinar Oney, LEVI & KORSINSKY, LLP, New York, New York; *Counsel for Plaintiff Patrick Ayers*

Michael A. Barlow & Hayden J. Driscoll, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Michael Carlinsky, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Defendants William P. Foley, Douglas K. Ammerman, Halim Dhanidina, Thomas M. Hagerty, Daniel D. Lane, Heather H. Miller, Sandra D. Morgan, John D. Rood, Peter O. Shea, Jr., Cary H. Thompson, and Nominal Defendant Fidelity National Financial, Inc.*

**WILL, Vice Chancellor**

This derivative action contests two compensation decisions made by a board of directors: a one-time equity grant to the company's founder and non-executive chairman, and compensation the directors awarded to themselves.

The defendants have moved to dismiss the suit under Court of Chancery Rules 23.1 and 12(b)(6). At the center of the motion is the recently amended 8 *Del. C.* § 144. Applying the statute to the challenged awards highlights an important distinction between conflicted transactions entrusted to a disinterested committee and those approved by directors who are themselves parties to the transaction.

Because the two committees that approved the chairman's equity grant were composed of directors deemed to satisfy national stock exchange independence standards, the plaintiff had to overcome the heightened presumption of disinterestedness codified in Section 144(d)(2). In conjunction with Rule 23.1, this statutory mandate elevates the burden to rebut a director's impartiality, requiring substantial and particularized allegations of a material interest or relationship. The complaint falls short of this demanding standard.

The plaintiff also failed to plead that a majority of the board faces a substantial likelihood of liability for approving the grant. Given the interlocking protections of Section 144(a)(1)'s safe harbor and the company's Section 102(b)(7) exculpatory provision, the plaintiff was required to plead particularized facts supporting a

reasonable inference of bad faith. The complaint does not support such an inference. Demand is not excused as to the equity grant-related claims, which are dismissed.

The directors' self-compensation is a different matter because the approving committee members are inherently interested. Absent a stockholder vote compliant with Section 144(a)(2), the approval must meet the entire fairness standard. At the pleading stage, the plaintiff sufficiently alleged that the compensation was the product of unfair dealing and an unfair price. The breach of fiduciary duty claim is viable against the directors who approved the compensation, but not those who only passively received the awards. The related unjust enrichment claim concerning director compensation also survives against all director defendants.

The motion to dismiss is therefore granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The following facts are drawn from the Verified Stockholder Derivative Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.    Fidelity National Financial, Inc. and Its Board

Nominal defendant Fidelity National Financial, Inc. ("FNF" or the "Company") is a Nevada corporation that trades on the New York Stock Exchange

---

[1] Verified S'holder Deriv. Compl. (Dkt. 1) ("Compl."); *see In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006). Documents attached to the Transmittal Affidavit of Hayden J. Driscoll in Support of Defendants' Opening Brief in Support of Their Motion to Dismiss are cited as "Defs.' Ex. __" unless otherwise defined. Trans. Aff.

(NYSE).[2]  It provides title insurance, mortgage loan servicing, and other real estate services.   FNF was a Delaware corporation until June 11, 2025, when it re-domesticated to Nevada.[3]  The plaintiff filed this suit on June 10—one day before the re-domestication took effect.[4]

At the time this suit was filed, FNF's Board of Directors (the "Board") had eleven members.  Nine are non-employee directors ("NEDs") and were determined by the Board to qualify as independent under NYSE rules.[5]  The other two are William P. Foley and Raymond R. Quirk.[6]  Foley founded FNF in 1984, and previously served as its President, Chief Executive Officer, and Executive Chairman.[7]  He has been the Company's Non-Executive Chairman since 2016, and currently owns 3.6% of its outstanding shares.[8]  Quirk is the Executive Vice Chairman of the Board, having assumed that role in February 2022.[9]  Before then,

---

of Hayden J. Driscoll in Supp. of Defs.' Opening Br. in Supp. of Mot. to Dismiss Verified S'holder Deriv. Compl. (Dkt. 12).  Certain documents were produced in response to a demand under 8 *Del. C.* § 220 and are deemed incorporated by reference into the Complaint.  *See* 8 *Del. C.* § 220(b)(3).

[2] Compl. ¶ 11; *see* Defs.' Ex. 4.

[3] *See* Defs.' Ex. 4; *see also* Compl. ¶ 54.

[4] *See* Dkt. 1.

[5] Compl. ¶ 25; Defs.' Ex. 2 (proxy statement) 14.

[6] Compl. ¶¶ 2, 26.

[7] *Id.* ¶ 12.

[8] *Id.* ¶¶ 12, 88; *see also* Defs.' Ex. 2 at 117.

[9] Compl. ¶¶ 2, 26.

he was FNF's Chief Executive Officer.[10]  All Board members except Quirk are named as defendants in this suit.[11]

## B.    The Incentive Plan and the Compensation Committee

Under its charter, FNF's Compensation Committee is tasked with setting salaries and approving incentive compensation and equity grants for officers and directors.[12]

Equity grants to Company directors and officers are subject to FNF's Amended and Restated 2005 Omnibus Incentive Plan (the "Incentive Plan"), which was approved by FNF stockholders in 2016.[13]  The Incentive Plan's objective is "to optimize the profitability and growth of the Company through incentives" that link the personal interests of participants "to those of the Company's stockholders."[14] The Incentive Plan is meant "to provide flexibility to the Company . . . to motivate, attract and retain the services of [p]articipants who make or are expected to make

---

[10] *Id.* ¶ 26.

[11] *See id.* ¶¶ 25-26.

[12] *See* Defs.' Ex. 2 at 18.

[13] Compl. ¶¶ 27-28; Defs.' Ex. 1 ("Incentive Plan") § 3.2.

[14] Incentive Plan § 1.2.

4

significant contributions to the Company's success."[15]  It vests the Compensation Committee with plenary authority over awards, including the power to delegate.[16]

The Compensation Committee relies on outside advisors to fulfill its mandate. In August 2022, the Compensation Committee engaged Strategic Compensation Group LLC ("SCG") as its compensation consultant.[17]  At a February 2023 meeting, the Compensation Committee determined that SCG qualified as independent under NYSE rules.[18]  But the plaintiff alleges that the engagement of SCG, which had ties to other Foley-affiliated entities, was an abrupt switch from a prior advisor.[19]

For equity awards granted under the Incentive Plan, the Compensation Committee established "title operating margin" as the operative performance metric.[20]  The title operating margin (or adjusted pre-tax title margin) measures the profitability of FNF's title segment.[21]  The Compensation Committee chose this

---

[15] *Id.*

[16] *Id.* § 3.2.

[17] Compl. ¶ 31; Defs.' Ex. 8.

[18] Defs.' Ex. 12 at FNF_AYERS_220_00000121.

[19] Compl. ¶ 31; Defs.' Ex. 8 at FNF_AYERS_220_00000088.

[20] Defs.' Ex. 6 at FNF_AYERS_220_00000002; Defs.' Ex. 9 at FNF_AYERS_220_00000090; Defs.' Ex. 13 at FNF_AYERS_220_00000125-0126.

[21] Defs.' Ex. 2 at 102 n.10.  FNF calculates adjusted pre-tax title margin by dividing the earnings before income taxes and non-controlling interests from its title segment, excluding recognized gains and losses, purchase accounting amortization, and other unusual items, by the total revenues of the title segment excluding recognized gains and losses.  *See id.*

metric because it viewed it as "the best and most meaningful measurement goal to determine whether management has achieved superior performance when benchmarked against [FNF's] title competitors."[22] Equity awards vest "if the title operating margin threshold is achieved in two of the next five fiscal quarters commencing in the fourth quarter of [each year] and ending in the fourth quarter of [the next]."[23]

## C. 2022 and 2023 Director Compensation

In November 2021, the Compensation Committee increased the title operating margin threshold for 2021 equity grants to 12%, evaluated based on performance from the fourth quarter of 2021 to the fourth quarter of 2022.[24] In August 2022, the committee was informed that FNF had achieved a 22.4% title operating margin for the fourth quarter of 2021 and 17.1% for the first quarter of 2022.[25] This exceeded the margin performance of FNF's competitors.[26]

---

[22] Defs.' Exs. 6, 9, 13.

[23] *E.g.*, Defs.' Ex. 6 at FNF_AYERS_220_00000002.

[24] *Id.*

[25] Defs.' Ex. 8 at FNF_AYERS_220_00000088.

[26] Defs.' Ex. 7 at FNF_AYERS_220_00000010 ("Excluding FNF, the average 2020 full year adjusted pretax title margin for the national title insurers was 11.2%, and for the first half of 2021[,] the average was 12.9%.").

Based on that performance, in November 2022, the Compensation Committee approved director compensation increases for 2022.[27] Foley's compensation remained flat at $500,000 in cash and $500,000 in equity.[28] The NEDs' annual cash retainer increased by $10,000 (from $80,000 to $90,000) and their annual equity grants increased by $16,675 (from $248,325 to $265,000).[29] The plaintiff alleges that these increases were excessive because FNF's revenue and net income placed it near median among its peer group.[30] Citing "rising interest rates and economic recession expectations for 2023," the Compensation Committee set the 2022 title operating margin goal at 7.5%.[31]

In early 2023, the Compensation Committee was informed that FNF achieved a margin of 12.3% in the fourth quarter of 2022.[32] Later, in November 2023, the committee approved a $15,000 boost to the NEDs' equity grants for 2023, and a $10,000 increase to their annual cash retainer starting in 2024.[33] It also approved a $30,000 increase to Foley's equity grant (raising it to $530,000); his cash

---

[27] *See* Defs.' Ex. 9 at FNF_AYERS_220_00000091-092.

[28] Compl. ¶ 34; Defs.' Ex. 10 at FNF_AYERS_220_00000095.

[29] Compl. ¶ 34; Defs.' Ex. 9 at FNF_AYERS_220_00000091-092.

[30] Compl. ¶¶ 33, 40.

[31] Defs.' Ex. 11 at FNF_AYERS_220_00000111.

[32] Defs.' Ex. 12 at FNF_AYERS_220_00000120.

[33] Defs.' Ex. 13 at FNF_AYERS_220_00000126.

compensation remained unchanged.[34] The plaintiff avers that the 2023 director compensation was again excessive and untethered to FNF's financial performance compared to its peers.[35]

### D. 2024 Director Compensation

According to the Complaint, aspects of FNF's 2024 performance—market capitalization, revenue, and net income—remained mediocre.[36] Yet the Compensation Committee remained focused on the Company's title operating margin when determining whether the performance conditions for restricted stock awards had been met.[37] In the fourth quarter of 2023 and first quarter of 2024, FNF's title operating margin was 11.8% and 10.7%, respectively, exceeding the Compensation Committee's 7.5% goal.[38] The Company's 2025 proxy statement reported an industry-leading 15.1% pre-tax title margin for 2024.[39] Overall performance was also buoyed by the financial success of F&G Annuities & Life,

---

[34] *Id.*

[35] Compl. ¶¶ 51-53.

[36] *See id.* ¶ 59.

[37] Defs.' Ex. 15 at FNF_AYERS_220_00000155; Defs.' Ex. 17 at FNF_AYERS_220_00000161.

[38] Defs.' Ex. 15 at FNF_AYERS_220_00000155; Defs.' Ex. 17 at FNF_AYERS_220_00000161.

[39] Defs.' Ex. 2 at 66.

Inc., which had grown its market capitalization by $2.6 billion since FNF acquired it in 2020.[40]

At an October 14, 2024 meeting, the Compensation Committee approved a $20,000 increase to the NEDs' annual cash retainer and a one-time special equity grant of $100,000 for each NED, vesting over three years.[41] The committee's stated rationale for the special grant was "FNF's superior financial performance, including the success of the F&G acquisition in 2020."[42] Foley did not receive the $20,000 cash increase or the $100,000 special equity grant.

### E. The Equity Grant

On October 8, 2024, an article published in *MarketWatch* quoted Foley as saying he was "going back to a private environment scenario and trying to move away from [his] public companies."[43] Around this time, Compensation Committee member Cary H. Thompson discussed with Foley a potential equity award to retain Foley as Chairman through 2027 and reward his contributions to FNF and F&G.[44]

---

[40] *Id.* at 66, 106; *see* Compl. ¶¶ 13(a), 74.

[41] Defs.' Ex. 17 at FNF_AYERS_220_00000163; Defs.' Ex. 2 at 111; *see* Compl. ¶ 60.

[42] Defs.' Ex. 17 at FNF_AYERS_220_00000163; *see* Compl. ¶ 62.

[43] Defs.' Ex. 16 at FNF_AYERS_220_00000189.

[44] Defs.' Ex. 18 at FNF_AYERS_220_00000175; *see* Compl. ¶ 66.

Initially, Foley requested a $60 million grant of restricted shares.[45] Thompson and Compensation Committee Chair Thomas M. Hagerty discussed Foley's ask and sought market research from SCG.[46] After reviewing the material, Thompson and Hagerty determined that a $44 million grant aligned with market percentiles.[47] Further discussions ensued, and Thompson negotiated the outline of a $50 million equity grant vesting over three years, with 25% vesting on the grant date and 75% vesting proportionately each subsequent year subject to Foley's continued service as FNF's Chairman (the "Equity Grant").[48] As part of this arrangement, Foley would not receive any additional FNF equity awards until 2027.[49]

On October 14, the Compensation Committee held a joint meeting with the Related Person Transaction ("RPT") Committee to discuss the potential award to Foley.[50] The directors sought to retain Foley as FNF's Chairman "for at least the next three years, especially in light of anticipated market conditions."[51] The Compensation Committee reviewed SCG's market research about comparable

---

[45] Defs.' Ex. 18 at FNF_AYERS_220_00000175.

[46] *Id.*

[47] *Id.*

[48] *Id.* at FNF_AYERS_220_00000176; *see* Compl. ¶¶ 66, 85.

[49] Compl. ¶ 66; Defs.' Ex. 18 at FNF_AYERS_220_00000175; Defs.' Ex. 2 at 107.

[50] Compl. ¶ 58; Defs.' Ex. 19 at FNF_AYERS_220_00000209.

[51] Defs.' Ex. 19 at FNF_AYERS_220_00000209; *see* Compl. ¶ 84.

awards granted to chairmen and executives at peer and other companies.[52] It also noted Foley's "integral role in FNF's strategic acquisition of F&G in 2020, which has had a direct positive impact on FNF's business performance and added over $2 billion to FNF's market capitalization," his "ongoing contributions to FNF and F&G," and that he remained a "driving force behind . . . FNF's strategic direction."[53]

The Compensation Committee determined that "in light of the significance" of the Equity Grant, "the Compensation Committee's approval would be subject to the approval, disapproval, or modification of the Equity Grant by the" RPT Committee.[54] The Compensation Committee adopted a formal resolution to that effect.[55] Thompson abstained from the vote due to his involvement in the negotiations with Foley and his role at Bank of America, which had a business relationship with FNF.[56]

## F. The RPT Committee's Approval

The RPT Committee, consisting of the Honorable Halim Dhanidina (the committee's Chair) and Sandra Morgan, held a special meeting on October 16, 2024

---

[52] Defs.' Ex. 19 at FNF_AYERS_220_00000209; Compl. ¶ 69.

[53] Defs.' Ex. 19 at FNF_AYERS_220_00000209; Compl. ¶ 73.

[54] Defs.' Ex. 19 at FNF_AYERS_220_00000210; *see* Compl. ¶ 91.

[55] Defs.' Ex. 19 at FNF_AYERS_220_00000210; Compl. ¶ 89.

[56] Compl. ¶ 90; Defs.' Ex. 19 at FNF_AYERS_220_00000210.

to discuss the proposed Equity Grant.[57] The committee discussed SCG's independence and requested the most recent copy of SCG's independence report.[58] It scheduled another meeting to review SCG's materials and requested a legal memorandum from FNF's in-house counsel on applicable Delaware law.[59]

On October 21, the RPT Committee reconvened, with SCG in attendance.[60] The committee reviewed SCG's independence report.[61] SCG also summarized its market research and explained that the data supported the Equity Grant because "Foley's services and functions for FNF put him in closer alignment with CEO/Executive Chairman peer group comparables than the Non-Executive Chairman peer group comparables."[62]

On October 22, the RPT Committee received the legal memorandum it had requested from FNF's General Counsel.[63] On October 28, Dhanidina emailed FNF's counsel, copying Morgan:

> On behalf of Sandra [Morgan] and myself, I wanted to thank you for the legal brief you provided last week and to let you know that after a review of the brief and our meeting with [SCG], the

---

[57] Defs.' Ex. 20 at FNF_AYERS_220_00000212; Compl. ¶¶ 17, 21, 91; Defs.' Ex. 2 at 22.

[58] Defs.' Ex. 20 at FNF_AYERS_220_00000212.

[59] *Id.*

[60] Compl. ¶ 91.

[61] Defs.' Ex. 14; Defs.' Ex. 21.

[62] Defs.' Ex. 21.

[63] Defs.' Ex. 22; Defs.' Ex. 2 at 64.

> RPT [C]ommittee concurs with the [C]ompensation [C]ommittee's determination that the proposed equity grant to Mr. Foley of $50mm in stock over three years is appropriate and in the best interests of FNF.[64]

The plaintiff characterizes the RPT Committee's review as an empty formality.[65] He highlights that the RPT Committee's approval of the Equity Grant was delivered by email rather than a formal resolution at a duly convened meeting or by written consent.[66]

## G.    This Litigation

Patrick Ayers, a stockholder of FNF, filed suit on June 10, 2025, after receiving documents produced by the Company in response to his Section 220 demand.[67] The parties agreed that the Company's production could be considered by the court in resolving any motion to dismiss.[68] Ayers' Complaint advances two counts—breach of fiduciary duty and unjust enrichment—against the "Director Defendants" in connection with their 2022, 2023, and 2024 compensation.[69]

---

[64] Defs.' Ex. 23; *see* Compl. ¶ 93.

[65] Compl. ¶¶ 93-94.

[66] *Id.* ¶ 93.

[67] *See* Dkt. 1.

[68] Defs.' Ex. 24 ¶ 10; *see supra* note 1.

[69] Compl. ¶¶ 118-28; *see id.* ¶ 25 (defining the "Director Defendants" as "Foley and the 9 NEDs ([Douglas K.] Ammerman, Dhanidina, Hagerty, [Daniel D.] Lane, Morgan, [Heather H.] Miller, [John D.] Rood, [Peter O.] Shea[, Jr.], and Thompson)").

The defendants moved to dismiss the Complaint on August 1, 2025.[70]  The plaintiff opposed the motion on October 10, and the defendants filed a reply brief in further support of their motion on November 17.[71]  Oral argument was held on March 9, 2026, after which the matter was taken under advisement.[72]

## II.   ANALYSIS

The defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand excusal and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

In the analysis that follows, I first resolve whether the plaintiff has adequately pleaded that a demand on the Board would have been futile.  I conclude that the Complaint lacks particularized facts demonstrating demand futility regarding Foley's 2024 Equity Grant.

I then turn to whether the plaintiff has stated a viable claim regarding the director compensation awarded in 2022, 2023, and 2024.  I dismiss the claim as to the directors who only passively received the compensation but sustain it as to the Compensation Committee members who approved those awards.  Finally, I address

---

[70] *See* Defs.' Opening Br. in Supp. of Mot. to Dismiss Verified S'holder Deriv. Compl. (Dkt. 12) ("Defs.' Opening Br.").

[71] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Verified S'holder Deriv. Compl. (Dkt. 19) ("Pl.'s Answering Br."); Defs.' Reply Br. in Further Supp. of Mot. to Dismiss Verified S'holder Deriv. Compl. (Dkt. 24) ("Defs.' Reply Br.").

[72] *See* Tr. of Mar. 9, 2026 Oral Arg. on Defs.' Mot. to Dismiss (Dkt. 32) ("Hr'g Tr.").

the unjust enrichment claim, which survives against all director defendants who retained the challenged compensation.

## A. Whether Demand Is Futile Regarding the Equity Grant

"The business and affairs of every corporation" is "managed by or under the direction of a board of directors."[73] This managerial authority includes whether the corporation should "initiate, or refrain from entering, litigation."[74] To preserve this substantive principle of Delaware law, a stockholder seeking to direct a corporate litigation asset must either make a pre-suit demand on the board to pursue the claims or plead with particularity why doing so would be futile.[75] Because the plaintiff did not make a demand,[76] he must show that demand should be excused.

"Plaintiffs who forgo making a demand must 'comply with stringent requirements of factual particularity' when alleging demand futility."[77] Their pleading must demonstrate, through particularized facts "on a director-by-director basis," that:

---

[73] 8 *Del. C.* § 141(a).

[74] *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981).

[75] *See United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021).

[76] *See* Compl. ¶ 106.

[77] *In re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *6 (Del. Ch. Jan. 31, 2022) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)), *aff'd*, 285 A.3d 1204 (Del. 2022).

15

(a) "the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;"

(b) "the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand;" or

(c) "the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand."[78]

"[I]f the answer to any of the questions is 'yes' for at least half of the members of the demand board," then demand is excused as futile at the pleading stage.[79]

Before applying the *Zuckerberg* test, I consider the scope of the "alleged misconduct" at issue.[80] The plaintiff asserts that the approvals of the 2024 director compensation and Foley's Equity Grant should be reviewed as a single Board act.[81] In doing so, he seeks to extend Delaware law's skepticism that a director can "fairly and impartially consider" challenges to "his or her own compensation" to the approval of the Equity Grant.[82] This approach is flawed. Because the 2024 director

---

[78] *Zuckerberg*, 262 A.3d at 1059.

[79] *Firemen's Ret. Sys. of St. Louis v. Sorenson*, 2021 WL 4593777, at *7 (Del. Ch. Oct. 5, 2021) (confirming that the court "counts heads" to determine whether a board majority is "disinterested and independent" (citation omitted)).

[80] *Zuckerberg*, 262 A.3d at 1059.

[81] Pl.'s Answering Br. 17-20.

[82] *Calma v. Templeton*, 114 A.3d 563, 576 (Del. Ch. 2015); *see* Pl.'s Answering Br. 35-36.

16

compensation and Foley's Equity Grant are distinct transactions, they must be analyzed separately for purposes of demand futility.

## 1. The Scope of the Alleged Misconduct

The plaintiff's legal theory has shifted throughout this litigation. His Complaint framed the 2024 compensation awards as a "quid pro quo" in which "the NEDs agreed to Foley's $50 million windfall, and Foley did not object to the NEDs giving themselves an unjustified $100,000 gratuity."[83] He has since walked that narrative back, conceding that Foley—a 3.4% stockholder—lacked the capacity to set NED compensation.[84] There are no allegations that Foley controlled the Compensation Committee, that he had the power to award the NEDs $100,000, or that the NED awards and Equity Grant were linked.[85] Absent particularized facts

---

[83] Compl. ¶ 8 (italics removed); *see also id.* ¶¶ 97, 110.

[84] *See* Hr'g Tr. 61-62 (Plaintiff's Counsel: "We are not arguing that this was a quid pro quo in the sense that [the directors] gave something and Foley gave something . . . . Foley had no capacity to give anything. He was a 3.4% stockholder."); *see also* Pl.'s Answering Br. 13 n.52 (noting that "the existence of a *quid pro quo* is not a prerequisite for denying Defendants' motion").

[85] The sole case that the plaintiff relies on for this argument, *Elburn v. Albanese*, is inapposite. *See* Pl.'s Answering Br. 13 n.51. In *Elburn*, directors agreed to give up equity awards in a settlement to secure an undisclosed agreement for the provision of replacement awards in the future. 2020 WL 1929169, at *9 (Del. Ch. Apr. 21, 2020). Nothing similar is alleged here.

17

demonstrating a specific agreement or quid pro quo, separate compensation decisions cannot be conflated into a unitary transaction to excuse demand on both.[86]

The plaintiff now argues that because "everybody got something" in 2024, the NED compensation and the Equity Grant should be viewed as one transaction.[87] In support, he relies on the Delaware Supreme Court's decision in *In re Investors Bancorp, Inc. Stockholder Litigation*.[88] But that case is fundamentally different. There, after a series of compensation committee meetings, "the entire board" met to receive from compensation advisors and "approve all the components of the incentive stock and stock option grants" to both executive and non-employee directors.[89] Given the unified process, the court held that demand was futile on all compensation decisions because it "would require [non-employee] directors to call into question the grants they made to themselves."[90]

Here, by contrast, the record reflects two discrete decisions. The first was the annual approval of the NEDs' compensation.[91] The second was a bespoke,

---

[86] *See In re Vaxart, Inc. S'holder Litig.*, 2022 WL 1837452, at *24-26 (Del. Ch. June 3, 2022) (rejecting a quid pro quo theory where compensation decisions were separate in time and process).

[87] Hr'g Tr. 62; *see also* Pl.'s Answering Br. 17-20.

[88] 177 A.3d 1208, 1215 (Del. 2017).

[89] *Id.* (citation omitted).

[90] *Id.* at 1225-26.

[91] *See Vaxart*, 2022 WL 1837452, at *26.

18

conditional grant to a differently situated director—the Company's founder and Chairman—to ensure his continued dedication to FNF after he publicly stated an intention to shift his focus elsewhere.

Although the Compensation Committee considered both matters during the same regularly scheduled October 14 meeting,[92] the processes then diverged. The NED compensation was definitively approved by the Compensation Committee on October 14.[93] But given the significance of the award, the Compensation Committee conditioned its approval of the Equity Grant on the RPT Committee's approval.[94] The RPT Committee subsequently held meetings without the Compensation Committee, reviewed SCG's independence, evaluated the data provided by SCG, was advised by FNF's General Counsel, and reached its own decision to approve the Equity Grant two weeks later.[95] Because the NED compensation had already been approved when the RPT Committee evaluated Foley's Equity Grant, its

---

[92] Compl. ¶¶ 60, 66; Defs.' Ex. 17 at FNF_AYERS_220_00000162-0163.

[93] Compl. ¶ 60; Defs.' Ex. 17 at FNF_AYERS_220_00000163.

[94] Defs.' Ex. 19 at FNF_AYERS_220_00000210; *see also* Defs.' Ex. 18 at FNF_AYERS_220_00000180.

[95] *See* Defs.' Ex. 14; Defs.' Exs. 21-23; *see Vaxart*, 2022 WL 1837452, at *26 (distinguishing *Investors Bancorp* when assessing contested compensation decisions because each decision "occurred on [a] different day").

consideration of his award could not "call into question" the committee members' own awards.[96]

The plaintiff insists that the RPT Committee's approval was "ultra vires" and therefore irrelevant.[97] Specifically, he contends that the Incentive Plan vests exclusive authority over equity awards in the Compensation Committee, precluding any delegation to the RPT Committee.[98] The Incentive Plan says no such thing. Rather, it permits the Compensation Committee to delegate its authority "[a]s permitted by law."[99] There are also no particularized facts in the Complaint making it reasonable to infer that the Compensation Committee's decision to involve the RPT Committee was "empty formalism."[100] Indeed, the referral was a business

---

[96] *Invs. Bancorp*, 177 A.3d at 1226.

[97] Hr'g Tr. 82; *see also* Pl.'s Answering Br. 14, 26 (calling the RPT Committee's approval "invalid ab initio" and "void ab initio").

[98] *See* Pl.'s Answering Br. 14.

[99] Incentive Plan § 3.2 ("As permitted by law, the Committee may delegate its authority as identified herein."); *see generally* 8 *Del. C.* § 141(c). The plaintiff also alleges that the Incentive Plan "expressly forbids" granting equity awards as a reward for past service. Pl.'s Answering Br. 10. But the Incentive Plan contains no such express prohibition. And regardless, its stated purpose is to help the Company "motivate, attract, and retain the services" of participants. Incentive Plan § 1.2. That purpose is consistent with the rationale for Foley's Equity Grant as stated in the Compensation Committee minutes. *See* Defs.' Ex. 19 at FNF_AYERS_220_00000210 (noting that the Equity Grant's purpose was to "incentivize and retain Mr. Foley's services").

[100] Pl.'s Answering Br. 22.

20

judgment made by the Compensation Committee that reflects sound corporate governance.

Finally, the plain text of *8 Del. C.* § 144(a)(1) further supports treating the awards as distinct. The statute provides a safe harbor for a specific "act or transaction" authorized in good faith and without gross negligence by a majority of the disinterested directors after the disclosure of the material facts.[101] The defendants invoke this provision regarding the approval of the Equity Grant.[102] If I were to adopt the plaintiff's logic, the "act or transaction" language would mean that a conflict in one action could disable the safe harbor for another action driven by different motivations and governed by an independent process. This broad reading would thwart the General Assembly's intent that a single "act or transaction" approved in accordance with the safe harbor is shielded from equitable relief or an award of damages.[103]

The approval of the NED compensation and the adoption of Foley's Equity Grant are separate transactions, and they must be analyzed as such. The defendants argue that demand is not excused regarding the Equity Grant; they do not contest

---

[101] 8 *Del. C.* § 144(a)(1).

[102] *See* Defs.' Opening Br. 47-48; *infra* Section II.A.4 (addressing *Zuckerberg* prong two).

[103] *See* 8 *Del. C.* § 144(a)(1); *see also infra* notes 116-119 (discussing the principles of statutory interpretation).

that demand would have been futile for the NED compensation.[104]  Accordingly, I apply the *Zuckerberg* test solely to the approval of the Equity Grant.

### 2.    *Zuckerberg* Prong One

The first prong of *Zuckerberg* asks whether a director "received a material personal benefit from the alleged misconduct that is the subject of the litigation demand."[105]  As addressed above, the specific "misconduct" at issue is the approval of the Equity Grant.[106]

The plaintiff has adequately pleaded—and the defendants do not dispute— that the $50 million Equity Grant was a material personal benefit to Foley, disabling him for demand purposes.[107]  But the plaintiff does not allege that any of the NEDs profited from the Equity Grant, and the plaintiff's quid pro quo theory was abandoned and is meritless.[108]  Demand is not excused as to the nine NEDs on that basis.

---

[104] *See* Defs.' Opening Br. 25-47.

[105] *Zuckerberg*, 262 A.3d at 1059.

[106] *See supra* Section II.A.1.

[107] *See Invs. Bancorp*, 177 A.3d at 1217 ("[W]hen the board fixes its compensation, it is self-interested in the decision because the directors are deciding how much they should reward themselves for board service."); *see also* Hr'g Tr. 24 (defendants' counsel stating that "Foley is in a spot by himself").

[108] *See supra* Section II.A.1.  Because the NEDs are not parties to the Equity Grant and are independent under NYSE rules, they are entitled to a heightened statutory presumption of disinterestedness. *See* 8 *Del. C.* § 144(d)(2); *infra* notes 133-134.  Had the plaintiff claimed that NEDs received a material personal benefit from the Equity Grant implicating the first

### 3. *Zuckerberg* Prong Three

The third *Zuckerberg* prong asks whether "the director lacks independence from someone who received a material personal benefit from the alleged misconduct . . . or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand."[109]  The plaintiff concedes that five of the Company's eleven Board members (Dhanidina, Lane, Miller, Morgan, and Shea) are independent of Foley.  He questions the independence of the other five directors (Ammerman, Hagerty, Rood, Thompson, and Quirk).[110]  If he were to succeed in impugning these directors' impartiality, then—combined with Foley—he would have adequately pleaded demand futility under Rule 23.1.  But he falls short of the high bar set by Section 144(d)(2) to plead that three of the five challenged directors—Ammerman, Hagerty, and Rood—have a material relationship with Foley.  Because establishing the independence of these three directors leaves the plaintiff without a conflicted majority under the third prong, I decline to address the plaintiff's allegations regarding Thompson and Quirk.

*Zuckerberg* prong, he would have been required to plead "substantial and particularized facts" to rebut this heightened presumption.  *Id.*; *see infra* Section II.A.3 (analyzing the heightened presumption of Section 144(d)(2) within the third *Zuckerberg* prong).

[109] *Zuckerberg*, 262 A.3d at 1059.

[110] Compl. ¶¶ 112-17.

23

a. Section 144(d)(2)'s Heightened Presumption of Disinterestedness

Directors of Delaware corporations are "presumed to be independent," including in the demand excusal context.[111] To overcome that presumption for demand futility purposes, Rule 23.1 requires a plaintiff to plead particularized facts creating "reasonable doubt" that a director could exercise impartial judgment.[112]

Recent amendments to 8 *Del. C.* § 144 strengthen the presumption of independence and disinterestedness when a corporation has a class of stock listed on a national securities exchange and the board determines that a director satisfies the exchange's independence criteria.[113] Under Section 144(d)(2), the director is entitled to a "heightened" presumption of disinterestedness "with respect to an act

---

[111] *Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004).

[112] *See, e.g.*, *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled on other grounds by Brehm*, 746 A.2d 244; *accord Invs. Bancorp*, 177 A.3d at 1225; *see also Zuckerberg*, 262 A.3d at 1041 (explaining that *Aronson* "remain[s] good law"); Ct. Ch. R. 23.1.

[113] 8 *Del. C.* § 144(d)(2) ("Any director of a corporation that has a class of stock listed on a national securities exchange shall be presumed to be a disinterested director with respect to an act or transaction to which such director is not a party if the board of directors shall have determined that such director satisfies the applicable criteria for determining director independence from the corporation and, if applicable with respect to the act or transaction, the controlling stockholder or control group, under the rules (and interpretations thereof) promulgated by such exchange (treating the applicable controlling stockholder and control group as if the controlling stockholder and control group were the corporation for purposes of applying such criteria to determine independence from a controlling stockholder or control group), which presumption shall be heightened and may only be rebutted by substantial and particularized facts that such director has a material interest in such act or transaction or has a material relationship with a person with a material interest in such act or transaction.").

24

or transaction to which such director is not a party."[114]  This presumption "may only be rebutted by substantial and particularized facts that such director has a material interest in such act or transaction or has a material relationship with a person with a material interest in such act or transaction."[115]

Delaware courts have yet to interpret Section 144(d)(2).  To do so, "well[-]settled" principles of statutory interpretation apply.[116]  When interpreting a statute, Delaware courts must "ascertain and give effect to the intent of the legislature."[117]  "If the statute is found to be clear and unambiguous, then the plain meaning of the statutory language controls."[118]  The statute must be read as a whole in harmony and "to avoid surplusage if reasonably possible."[119]

The application of Section 144(d)(2) is not confined to the safe harbors in Sections 144(a), (b), and (c).  Section 144(d)(2) speaks in terms of a "heightened presumption of disinterestedness" and the facts necessary to rebut that

---

[114] *Id*.  The plaintiff argued that Section 144(d)(2) is inapplicable because the NEDs were parties to the director compensation packages.  Pl.'s Answering Br. 31-32.  As explained above, they were not parties to the Equity Grant.  *See supra* Section II.A.1.

[115] 8 *Del. C.* § 144(d)(2).

[116] *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011) ("The rules of statutory construction are well settled.").

[117] *Ingram v. Thorpe*, 747 A.2d 545, 547 (Del. 2000).

[118] *Ins. Com'r of Del. v. Sun Life Assur. Co. of Can. (U.S.)*, 21 A.3d 15, 20 (Del. 2011); *see also CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011).

[119] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 117-18 (Del. 2020) (citation omitted).

25

presumption—not the insulation of conflicted transactions from monetary or equitable relief.

Where the General Assembly intended a provision to apply only within Section 144, it said so expressly. In Section 144(d) itself, the legislature took care to confine a provision to specific paragraphs—and did so within paragraph (d)(7), where it named three other paragraphs to which the rule applies.[120] Similarly, the preface to Section 144(e) states that its definitions are "[f]or purposes of this section."[121] Section 144(d)(2) contains no such limiting language.

If "provisions are expressly included in one part of a statute, but omitted from another, it is reasonable to conclude that the legislature was aware of the omission and intended it."[122] The purposeful omission of limiting language in paragraph (d)(2) illustrates the legislature's intent that the heightened presumption apply broadly, including when assessing director disinterestedness for purposes of Rule

---

[120] 8 *Del. C.* § 144(d)(7) ("Shares irrevocably accepted for purchase or exchange pursuant to an offer contemplated by § 251(h) of this title shall be deemed voted in favor of the act or transaction . . . for purposes of determining whether the act or transaction has been approved *for purposes of paragraphs (a)(2), (b)(2), and (c)(1) of this section*." (emphasis added)).

[121] *See 8 Del. C.* § 144(e) (providing definitions "[f]or purposes of this section"); *see also*, *e.g.*, 8 *Del. C.* §§ 145(c), 145(h), 145(i), 203(c) (using limiting language).

[122] *In re Adoption of Swanson*, 623 A.2d 1095, 1097 (Del. 1993); *see also Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) ("The legislative body is presumed to have inserted every provision for some useful purpose . . . , and when different terms are used in various parts of a statute[,] it is reasonable to assume that a distinction between the terms was intended." (citation omitted)).

26

23.1.[123]  Reading paragraph (d)(2) to apply solely within Section 144 would also deprive the limiting language in paragraph (d)(7) and subsection (e) of independent meaning, contrary to settled principles of statutory construction.[124]

Although Rule 23.1 already requires particularized facts to rebut the presumption of independence and disinterestedness, Section 144(d)(2) goes further by requiring both "substantial and particularized facts."[125] The inclusion of the additional modifier suggests a legislative intent to strengthen the presumption beyond the Rule 23.1 standard.[126]  "Particularize" means "to state in detail" or "specify."[127]  And Delaware courts have long interpreted Rule 23.1's particularity standard in that way, rejecting generalized or conclusory allegations unsupported by

---

[123] Evaluating Section 144(d)(2) when resolving demand futility is analogous to how courts consider other DGCL provisions that bear on the inquiry, such as Section 102(b)(7) when assessing whether directors face a substantial likelihood of liability under Rule 23.1.  *See Zuckerberg*, 262 A.3d at 1050; *see also* 8 *Del. C.* § 102(b)(7).

[124] *See supra* note 119 and accompanying text.  If Section 144(d)(2)'s heightened presumption did not apply when assessing demand futility, a plaintiff could face a lesser burden to plead director interest under Rule 23.1 than under Rule 12(b)(6).

[125] 8 *Del. C.* § 144(d)(2).

[126] *See Salzberg*, 227 A.3d at 117-18 (explaining that Delaware courts must "give meaning to every word in [a] statute" and presume that "the General Assembly purposefully chose particular language" (quoting *Sussex Cty. Dep't of Elections v. Sussex Cty. Republican Comm.*, 58 A.3d 418, 422 (Del. 2013))).

[127] *Particularize*, Merriam-Webster, https://www.merriam-webster.com/dictionary/particularize (last visited June 8, 2026); *see also Particularity*, Black's Law Dictionary (12th ed. 2024) (defining "particularity" as "the quality, state, or condition of being both reasonably detailed and exact <the requirement of pleading with particularity>").

specific facts.[128] The remaining question is what the legislature intended by requiring that those facts also be "substantial."

Black's Law Dictionary defines "substantial" in several ways.[129] Of the definitions relevant here, one is quantitative—"[c]onsiderable in extent, amount, or value; large in volume or number," and another is qualitative—"important, essential, and material; of real worth and importance."[130] Read in that context, Section 144(d)(2) uses "substantial" in the qualitative sense. The statute requires "substantial and particularized facts" demonstrating either "a material interest" in a transaction or "a material relationship" with an interested person.[131] The General Assembly's focus on materiality indicates that the facts must be significant enough to evidence a disabling conflict. Thus, to overcome Section 144(d)(2)'s heightened presumption, a plaintiff must plead specific, non-conclusory facts of sufficient

---

[128] *E.g.*, *Brehm*, 746 A.2d at 254 (discussing that allegations of demand futility under Rule 23.1 "must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)"); *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 285 (Del. Ch. 2003) (explaining that "mere speculation" does not satisfy Rule 23.1).

[129] *Substantial*, Black's Law Dictionary (12th ed. 2024).

[130] *Id.*; *see also Substantial*, Merriam-Webster, https://www.merriam-webster.com/dictionary/substantial (last visited June 8, 2026) (same); *Substantial*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/substantial (last visited June 8, 2026) (defining "substantial" as "large in size, value, or importance").

[131] 8 *Del. C.* § 144(d)(2); *see also id.* § 144(e)(7), (8) (defining "[m]aterial interest" and "[m]aterial relationship").

28

qualitative significance to support a reasonable inference of a material interest or relationship that would impair the director's objective judgment.[132]

### b. Ammerman, Hagerty, and Rood

The Board determined that Ammerman, Hagerty, and Rood each qualify as independent under NYSE rules.[133] They are therefore entitled to Section 144(d)(2)'s "heightened" presumption of disinterestedness.[134] To rebut that presumption for purposes of the third *Zuckerberg* prong, the plaintiff must plead "substantial and particularized facts" demonstrating that each director has a "material relationship" with Foley.[135] Section 144(e)(8) defines a "[m]aterial relationship" as a "familial, financial, professional, employment, or other relationship that . . . would reasonably

---

[132] *See id.* § 144(d)(2); *Zuckerberg*, 262 A.3d at 1061. This qualitative requirement aligns with Delaware's holistic approach to evaluating independence. The court assesses whether the director "had ties to the person whose proposal or actions he or she is evaluating that are sufficiently substantial" such that "he or she could not objectively discharge his or her fiduciary duties." *Zuckerberg*, 262 A.3d at 1061 (quoting *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014)). It reviews pleaded facts "in their totality and not in isolation from each other." *Delaware Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015). But volume alone cannot substitute for materiality; a collection of trivial facts will not satisfy Section 144(d)(2) simply by force of accumulation. The pleaded facts, taken together, must be substantial enough to support a reasonable inference of a material interest or relationship.

[133] Defs.' Ex. 2 at 14.

[134] 8 *Del. C.* § 144(d)(2).

[135] *Id.*; *see supra* Section II.A.3.a (describing this heightened presumption). As noted above, because the NEDs are not parties to the Equity Grant and received no material personal benefit from it, they lack a "material interest" under the statute. *See supra* note 108 (discussing the absence of a material interest for the NEDs concerning the Equity Grant); 8 *Del. C.* § 144(e)(7).

29

be expected to impair the objectivity of the director's judgment when participating in the negotiation, authorization, or approval of the act or transaction at issue."[136] The allegations in the Complaint do not meet this exacting standard.

The plaintiff asserts that Ammerman, Hagerty, and Rood cannot impartially consider a demand regarding the Equity Grant because they have "extensive business ties" with Foley.[137] But their only alleged direct relationship with Foley relates to overlapping service on FNF's Board and the boards of other Foley-affiliated companies (e.g., F&G, Cannae Holdings, Inc., and Dun & Bradstreet, Inc.).[138] These facts alone cannot rebut the directors' presumed independence.[139]

---

[136] 8 *Del. C.* § 144(e)(8).

[137] Compl. ¶¶ 113-15.

[138] *Id.* Specifically, Ammerman serves on the board of Cannae, F&G, and Dun & Bradstreet; Hagerty sits on the Dun & Bradstreet board; and Rood sits on the F&G board. Compl. ¶¶ 113-15; *see* Defs.' Ex. 2 at 14-15. Foley serves as the Executive Chairman of F&G; the Chairman, CEO, and Chief Investment Officer of Cannae; and the Executive Chairman of Dun & Bradstreet. Compl. ¶ 13(a), (b), (d).

[139] *See, e.g.*, *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *39 (Del. Ch. Jan. 27, 2021) (explaining that overlapping board service, standing alone, does not compromise independence); *Beam*, 845 A.2d at 1051 (noting that allegations that directors "moved in the same social circles" or "developed business relationships" as "a result of collegial relationships among the board of directors" cannot "standing alone . . . render pre[-]suit demand futile"); *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

The plaintiff attempts to bolster his argument by aggregating the fees Ammerman and Rood received for serving on these boards over the past 10 years.[140] He neglected, however, to plead particularized facts explaining why they are personally material to the directors—each of whom is a successful professional.[141] Nor did the plaintiff's opposition brief address the defendants' argument that these fees are immaterial to the directors, thereby waiving any opposition.[142]

The other relationships described in the Complaint are indirect business connections—primarily co-investments in sports teams. In the plaintiff's view, Ammerman, Hagerty, and Rood lack independence because they "co-own the Vegas Golden Knights" with Foley "through Black Knight Sports and Entertainment," and Ammerman and Rood co-invest alongside Foley in European soccer teams through Black Knight Football and Entertainment.[143]

---

[140] Compl. ¶¶ 113, 115.

[141] *See In re Trade Desk, Inc. Deriv. Litig.*, 2025 WL 503015, at *18 n.158 (Del. Ch. Feb. 14, 2025) (holding that "[m]erely asserting that [a director's company] stock constitutes 'a substantial portion of her net worth,' without attempting to contextualize those holdings or quantify her net worth, is conclusory and falls short of Rule 23.1's requirement that Plaintiffs plead with particularity" (citation omitted)), *aff'd*, 350 A.3d 1223 (Del. 2025); *A.R. DeMarco Enters., Inc. v. Ocean Spray Cranberries, Inc.*, 2002 WL 31820970, at *5 (Del. Ch. Dec. 4, 2002) ("It is well established in Delaware law that ordinary director compensation alone is not enough to show demand futility."); *see also* Defs.' Ex. 2 at 27-28, 29 (describing the directors' professional backgrounds).

[142] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[143] Compl. ¶¶ 113-15.

31

There are several problems with this contention. To start, the Complaint's characterization of these investment relationships is misleading.[144] FNF's 2025 proxy statement explains that Ammerman, Hagerty, and Rood own a "small non-voting minority interest" in the entity that owns the Vegas Golden Knights, and Ammerman and Rood own a "minority interest" in the entity that invests in the soccer teams.[145] More to the point, the plaintiff does not allege that these co-investments give Foley any authority over Ammerman, Hagerty, or Rood, or make them beholden to him. He also does not allege facts about the directors' investment terms, voting rights, or financial exposure, or explain how the investments create a "bias-producing" relationship with Foley.[146] Indeed, FNF's Board considered these co-investments and concluded that none disqualify the three directors from satisfying NYSE independence rules.[147]

In response to these facts, the plaintiff resorts to a generalized claim that co-owning a professional sports franchise necessarily creates a material conflict

---

[144] *See infra* note 168 (discussing that the court does not accept unsupported allegations contradicted by documents incorporated by reference into the complaint).

[145] Defs.' Ex. 2 at 14; *see In re Gen. Motors*, 897 A.2d at 170-71 (noting that courts may take judicial notice of publicly filed SEC documents, such as proxy statements, on a motion to dismiss). The 2025 proxy statement is referred to and relied on in the Complaint. *See* Compl. ¶¶ 90, 116.

[146] *Zuckerberg*, 262 A.3d at 1061.

[147] Defs.' Ex. 2 at 14-15.

because it is an "exceedingly rare and prestigious opportunity."[148]  Yet there is nothing legally unique about investing in a sports franchise that alters the independence inquiry compared to other private ventures.  Broad conjecture about the exclusivity of indirect, minority co-investments in a sports franchise does not satisfy Rule 23.1's particularity standard, much less Section 144(d)(2)'s mandate of "substantial and particularized" facts.[149]

The plaintiff also points to Hagerty's role as a managing director at a private equity firm (Thomas H. Lee Partners, L.P.) that has transacted with Foley-affiliated entities, and Ammerman's limited partnership interest in an entity (Star Parent) where Foley serves as Chairman of the general partner.[150]  But he pleads no facts—much less particularized ones—that Ammerman or Hagerty received material personal benefits from Foley as a result of these roles.[151]  "Consistent with [the] predicate materiality requirement, the existence of some financial ties between the interested party and the director, without more, is not disqualifying."[152]

---

[148] Pl.'s Answering Br. 41; *see also id.* (arguing that investing in a sports team is "more rarified and exclusive than co-owning a private airplane or sharing a beach house").

[149] *See supra* Section II.A.3.a.

[150] Compl. ¶¶ 113-14.

[151] The same deficiency applies to the allegation that Hagerty was elected to Dun & Bradstreet's board.  *See id.* ¶ 114.  The plaintiff pleads no particularized facts attributing that election to Foley, much less showing that the role is material to Hagerty.

[152] *Zuckerberg*, 262 A.3d at 1061.

Taken together, these minor co-investments and overlapping board seats do not amount to "substantial and particularized facts" demonstrating a "material relationship" that would reasonably be expected to impair the directors' objective judgment.[153] The plaintiff has not, for example, alleged that Foley "has [the] means to deprive" Ammerman, Hagerty, or Rood of their wealth, "let alone wealth that is material to [them]."[154] "Alleging that a director had a 'personal friendship' with someone else, or that a director had an 'outside business relationship,' [is] 'insufficient to raise a reasonable doubt' that the director lacked independence."[155] Demand is not excused as to Ammerman, Hagerty, or Rood under *Zuckerberg* prong three.

### 4. *Zuckerberg* Prong Two

The second *Zuckerberg* prong asks whether "the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand."[156] The plaintiff has waived any argument under this prong. The "Demand

---

[153] 8 *Del. C.* §144(d)(2); *see id.* § 144(e)(8).

[154] *McElrath v. Kalanick*, 2019 WL 1430210, at *18 (Del. Ch. Apr. 1, 2019), *aff'd*, 224 A.3d 982 (Del. 2020).

[155] *Zuckerberg*, 262 A.3d at 1061 (citation omitted); *see also Trade Desk*, 2025 WL 503015, at *13 ("[M]ere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director.").

[156] *Zuckerberg*, 262 A.3d at 1059.

Futility" section of his Complaint is silent on whether FNF directors are exposed to a substantial likelihood of liability.[157]  The plaintiff also failed to address this prong in his answering brief.[158]  And at oral argument, his counsel reiterated the concession, stating that the second prong was "not relevant in the least" to the plaintiff's demand futility allegations.[159]

Regardless, the argument would fail on the merits.  Any claim that the directors face a substantial likelihood of liability for approving the Equity Grant must overcome two interconnected hurdles: the statutory safe harbor of 8 *Del. C.* § 144(a)(1) and FNF's exculpatory charter provision under 8 *Del. C.* § 102(b)(7).[160]  Together, these provisions narrow the circumstances in which directors can incur personal liability for approving an interested transaction.  Even if the plaintiff could establish that the requirements of Section 144(a)(1) were not satisfied, he would need to plead non-exculpated misconduct to survive Section 102(b)(7).

Section 144(a)(1) provides that a conflicted transaction "may not be the subject of equitable relief, or give rise to an award of damages, against a director" if

---

[157] *See* Compl. ¶¶ 102-17; *see also* Defs.' Opening Br. 44.

[158] *See generally* Pl.'s Answering Br.; *see also* Defs.' Reply Br. 23 (pointing out the concession).

[159] Hr'g Tr. 53-54 (Plaintiff's Counsel: "For the record, we are not arguing *Zuckerberg* prong two—substantial likelihood of liability. . . . We're not touching that.  That is not alleged in our [C]omplaint, and I do not believe it to be relevant in the least.").

[160] *See* Defs.' Ex. 5 Art. XII; 8 *Del. C.* § 144(a)(1).

the material facts of the conflict are "disclosed or are known to" the approving directors and the transaction is authorized "in good faith and without gross negligence" by "the affirmative votes of a majority of the disinterested directors" serving on the board or a committee.[161] To bypass the safe harbor and show a substantial likelihood of liability on a Rule 23.1 motion, the plaintiff must plead particularized facts supporting a reasonable inference that the safe harbor's requirements were unmet.[162]

Here, a majority of the Board—as well as a majority of both approving committees—is disinterested and independent for purposes of the Equity Grant.[163] Had the plaintiff defeated the safe harbor by alleging that material facts of Foley's conflict were not disclosed or known to the approving committees, or that their members approved the Equity Grant with gross negligence, the Section 102(b)(7) provision in FNF's charter would still exculpate those directors from personal

---

[161] 8 *Del. C.* § 144(a)(1). The legislative synopsis to the 2025 amendments to Section 144 confirms that when a board delegates approval power to a committee for a transaction, the safe harbor applies only if the committee "consist[ed] of at least 2 directors, all of whom, in the first instance, have been determined by the board of directors to be disinterested directors." Del. S.B. 21 syn., 153d Gen. Assem. (2025).

[162] *See* Hr'g Tr. 43-44 (defense counsel addressing how Section 144 applies to the *Zuckerberg* prong 2 analysis); *see also infra* note 168 (discussing the plaintiff's burden to plead noncompliance with the safe harbor).

[163] *See supra* Section II.A.3 (discussing *Zuckerberg* prong 3).

liability.[164]  As a result, the plaintiff can only establish a substantial likelihood of liability for the disinterested directors who approved the Equity Grant by pleading particularized facts supporting a reasonable inference that they acted bad faith.[165]

Bad faith sets a "high hurdle" that "essentially requires the plaintiff to demonstrate intentional wrongdoing by the board."[166]  To do so, the plaintiff was required to plead "particularized facts that demonstrate that the directors . . . had 'actual or constructive knowledge' that their conduct was legally improper."[167]  He made no attempt to do so.

In fact, the Board record incorporated into the Complaint undercuts any reasonable inference that the committees that approved Foley's Equity Grant failed

---

[164] Even if a plaintiff alleges that the Section 144(a)(1) safe harbor is unavailable because material facts were not disclosed to the approving committee or the committee was grossly negligent, Section 102(b)(7) shields the disinterested directors from personal liability unless the plaintiff sufficiently pleads that the directors' failure to uncover the concealed facts, or their complicity in the concealment, amounted to bad faith.  *See In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1175-76 (Del. 2015) ("A plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct[.]").

[165] *See Stone*, 911 A.2d 362, 370 (Del. 2006) ("[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest.  It also encompasses cases where the fiduciary fails to act in good faith.").

[166] *McElrath v. Kalanick*, 224 A.3d 982, 993 (Del. 2020).

[167] *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (citation omitted).

to comply with Section 144(a)(1).[168]  First, both the Compensation Committee and RPT Committee were comprised of disinterested directors.[169]  Second, the plaintiff has not pleaded that the "material facts as to [Foley's] relationship or interest" and "involvement in the initiation, negotiation, or approval of the act or transaction" were kept from the committees.[170]  Finally, the Complaint is devoid of non-

<hr>

[168] The plaintiff argues that the court's use of the Section 220 materials is limited to "determin[ing] whether any documents are taken out of context, but *not* to weigh evidence or make findings of fact."  Pl.'s Answering Br. 6.  That is partly true.  But it overlooks that the court will not accept allegations contradicted by the incorporated documents and draws only reasonable inferences in the plaintiff's favor.  *See Orman*, 794 A.2d at 16 n.9 ("If a plaintiff's complaint alleges a fact that is unambiguously contradicted by an integral document incorporated into the complaint and there are no other facts in that document supporting the allegation, the Court need not accept as true the fact as alleged in the complaint.  The Court may accept the fact as set forth in that incorporated document because, by doing so, the Court is not choosing between alternate interpretations of an ambiguous document but permissibly considering a fact recorded in a document integral to the plaintiff's claims."); *Beam v. Stewart*, 833 A.2d 961, 970 (Del. Ch. 2003) ("The Court will draw all inferences logically flowing from the amended complaint in favor of the plaintiff but only if such inferences are reasonable."), *aff'd*, 845 A.2d 1040.  The plaintiff bears the burden of pleading facts supporting a reasonable inference that Section 144's statutory requirements were not satisfied.  Where incorporated minutes reflect, for example, disclosure of the material facts and approval by a majority of disinterested directors, the court need not infer noncompliance.  Though the court does not weigh evidence at the pleading stage, a plaintiff cannot avoid dismissal by relying on conclusory statements, unreasonable inferences, or characterizations that are belied by the incorporated documents.

[169] The Compensation Committee had three members—Hagerty, Lane, and Thompson—when it approved the Equity Grant in 2024.  Compl. ¶ 58.  The plaintiff did not challenge Lane's independence, nor did he plead with particularity that Hagerty was interested.  *See supra* Section II.A.3.b.  As for the RPT Committee, neither of its two members—Dhanidina and Morgan—was challenged.

[170] 8 *Del. C.* § 144(a)(1).

conclusory facts placing in doubt that the committees acted "in good faith and without gross negligence."[171]

The minutes remove any reasonable inference otherwise. The Compensation Committee received expert compensation guidance from SCG and—despite having the authority to approve the deal—took the extra step of involving the RPT Committee.[172] It also negotiated more favorable terms for the Equity Grant, reducing Foley's original request by $10 million.[173] The RPT Committee likewise received expert compensation and legal advice, and evaluated the Equity Grant across multiple meetings before approving it.[174] Relying on an independent expert is far from the "conscious disregard for one's responsibilities" indicative of bad faith,[175]

---

[171] *Id.*

[172] *See* Defs.' Ex. 18 at FNF_AYERS_220_00000173-_0182; Defs.' Ex. 19 at FNF_AYERS_220_00000209.

[173] *See* Defs.' Ex. 18 at FNF_AYERS_220_00000175-0176.

[174] *See* Defs.' Ex. 20 at FNF_AYERS_220_00000212; Defs.' Ex. 21 at FNF_AYERS_220_00000213; *see also* Defs.' Ex. 23 (10/28/2024 Dhanidina email providing approval).

[175] *Knight v. Miller*, 2022 WL 1233370, at *7 (Del. Ch. Apr. 27, 2022) (citation omitted). The plaintiff alleges as a "point of interest" that SCG had prior relationships with FNF-affiliated companies. Compl. ¶ 92. But an "advisor's prior dealings with a counterparty to a transaction, standing alone, will not be adequate to plead a conflict of interest." *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *22 n.104 (Del. Ch. Aug. 18, 2017); *see also In re Inergy L.P.*, 2010 WL 4273197, at *14 (Del. Ch. Oct. 29, 2010) (concluding that a financial advisor's "prior dealings" with a counterparty to the transaction at issue did "not show that [the special committee's] decision to retain [the advisor] . . . was unreasonable"). The plaintiff also did not plead particularized facts suggesting that the aggregate fees SCG received from FNF and its

"or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason" necessary to demonstrate gross negligence.[176]

There are no particularized allegations in the Complaint supporting a reasonable inference that the Compensation or RPT Committees approved the Equity Grant in bad faith. Their members face no substantial likelihood of liability, and demand is not excused under *Zuckerberg* prong two.

*      *      *

In sum, to successfully plead demand futility, the plaintiff had to establish that at least six of FNF's eleven directors were incapable of impartially considering a litigation demand regarding the Equity Grant. He concedes that five directors are independent of Foley and did not plead substantial and particularized facts demonstrating that three more (Ammerman, Hagerty, and Rood) lack independence. Because there are no particularized allegations that these eight directors received a material personal benefit from the Equity Grant or face a substantial likelihood of non-exculpated liability concerning it, a Board majority remains disinterested and

---

affiliates were material to SCG such that they would compromise its professional objectivity. Furthermore, the Compensation Committee concluded that SCG was independent under NYSE rules, and the RPT Committee specifically reviewed and considered that decision. *See* Defs.' Ex. 12 at FNF_AYERS_220_00000121; Defs.' Ex. 15 at FNF_AYERS_220_00000156; Defs.' Ex. 21 at FNF_AYERS_220_00000213.

[176] *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at \*12 (Del. Ch. Apr. 5, 1990) (citation omitted).

independent with respect to the alleged misconduct.  Demand is not excused, and the plaintiff's claims premised on the Equity Grant are dismissed under Rule 23.1.[177]

## B. Whether the Plaintiff Stated a Claim Regarding Director Compensation

The plaintiff also claims that the director defendants were unjustly enriched and breached their duties of loyalty "by granting themselves and accepting compensation in amounts that were excessive and unfair to [FNF]."[178]  The defendants seek dismissal for failure to state a claim on which relief can be granted under Rule 12(b)(6).

The governing standard on a Rule 12(b)(6) motion is one of reasonable conceivability.[179]  The court must accept:

> all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any

---

[177] This includes Count I as well as the portion of the unjust enrichment claim in Count II concerning the Equity Grant.  *See Calma*, 2015 WL 1951930, at *20 (viewing unjust enrichment as duplicative of a breach of fiduciary duty claim where the plaintiff alleged no "unjust enrichment separate or distinct from the alleged breach of fiduciary duty"); *see also Bamford v. Penfold, L.P.*, 2020 WL 967942, at *32 n.25 (Del. Ch. Feb. 28, 2020) (explaining that where "allegations focus on self-dealing payments [the defendant] caused [the corporation] to make . . . the claim is exclusively derivative"); *infra* Section II.B.2.

[178] Compl. ¶¶ 121, 124-27.

[179] *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002).

reasonably conceivable set of circumstances susceptible of proof.[180]

I first assess the breach of fiduciary duty claim against the Compensation Committee directors who approved the 2022 to 2024 director compensation packages (other than the Equity Grant). I conclude that the plaintiff has stated a viable claim against them. I reach a different conclusion regarding the non-Compensation Committee directors who merely received the compensation. Finally, I address the unjust enrichment claim, which survives against all director defendants.

### 1. Breach of Fiduciary Duty

Section 141(h) of the DGCL authorizes a board to "fix the compensation of directors."[181] But when directors make discretionary compensation awards to themselves, they are necessarily interested in that act, placing it "outside the business judgment rule's presumptive protection."[182] As the Delaware Supreme Court held in *Investors Bancorp*, "the receipt of self-determined benefits is subject to an

---

[180] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[181] 8 *Del. C.* § 141(h).

[182] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002); *see also Gottlieb v. Heyden Chem. Corp.*, 90 A.2d 660, 663 (Del. 1952) ("[W]here a majority of the directors representing the corporation are conferring benefits upon themselves out of the assets of the corporation, we do not understand [the business judgment rule] to have any application what[so]ever.").

42

affirmative showing that the compensation arrangements are fair to the corporation."[183]

The defendants concede that neither Section 144(a)(1), which concerns approval by disinterested directors, nor Section 144(a)(2), which concerns approval by disinterested stockholders, applies to the challenged director compensation awards.[184] Instead, the defendants rely on Section 144(a)(3), which insulates an interested director transaction from monetary or equitable relief if it is "fair as to the corporation and the corporation's stockholders."[185] In this context, the statutory fairness inquiry tracks the common law entire fairness standard that traditionally governs the review of discretionary director self-compensation decisions.[186]

"Delaware law is clear that even where . . . entire fairness review is in play," a "plaintiff must make factual allegations about the transaction in the complaint that demonstrate the absence of fairness."[187] Because a conflict of interest "is not in itself

---

[183] *Invs. Bancorp*, 177 A.3d at 1217 (quoting *Telxon*, 802 A.2d at 265).

[184] *See* Defs.' Reply Br. 24. Given that the Compensation Committee directors were setting their own compensation, they were parties "to the act or transaction," precluding the application of Section 144(a)(1). 8 *Del. C.* § 144(e)(4).

[185] 8 *Del. C.* § 144(a)(3).

[186] *See* Del. S.B. 21 syn., 153d Gen. Assem. (2025) ("The references in § 144 to an act or transaction being 'fair as to the corporation and the corporation's stockholders'. . . is intended to be consistent with the entire fairness doctrine developed in the common law."); *see also* Defs.' Opening Br. 64-70.

[187] *Monroe Cnty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010).

43

a crime or a tort or necessarily injurious to others," the existence of a conflict alone cannot carry a plaintiff's pleading burden.[188]  He "must allege some facts that tend to show that the transaction was not fair."[189]  "Moreover, such a [pleading] burden in the self-compensation area cannot be simply conclusory, in light of the power the DGCL confers on directors to self-compensate."[190]

"There are two components to the 'unitary' entire fairness standard: fair dealing and fair price.  Because the test is not a bifurcated one, a plaintiff must allege facts supporting a reasonable inference of both unfair price and unfair dealing.  The failure to adequately plead either warrants dismissal."[191]  The plaintiff's claim must be dismissed as to the director defendants who took no part in the approval of their compensation.  As for the Compensation Committee members who approved the awards, however, the claim survives in part under binding precedent.[192]

---

[188] *In re Match Gp., Inc. Deriv. Litig.*, 315 A.3d 446, 461 (Del. 2024) (citation omitted).

[189] *Calma*, 114 A.3d at 589 (citation omitted).

[190] *Stein v. Blankfein*, 2019 WL 2323790, at *7 (Del. Ch. May 31, 2019).

[191] *Roofers Loc. 149 Pension Fund v. Fid. Nat'l Fin., Inc.*, 2025 WL 1354973, at *7 (Del. Ch. May 9, 2025) (citation omitted).

[192] The directors who took no part in approving the challenged compensation awards are Ammerman, Dhanidina, Morgan, Rood, Shea, and Foley.  As held above, the claims against Foley concerning his Equity Grant are dismissed for failure to plead demand futility.  The claim must also be dismissed against Miller regarding 2024 compensation, as he did not sit on the Compensation Committee that year.  The breach of fiduciary duty claim survives only against Hagerty, Lane, and Thompson for the 2022 to 2024 compensation, and against Miller for the 2022 and 2023 compensation.

### a. The Compensation Committee Directors

The defendants assert that the plaintiff made no effort to plead unfair dealing regarding annual director compensation and relied solely on his abandoned quid pro quo theory regarding the $100,000 grant in 2024.[193] They also note that the plaintiff highlights no defect in the Compensation Committee's process in 2022, 2023, or 2024. As a result, they argue—relying on this court's decision in *Roofers Local 149 Pension Fund v. Fidelity*—that the plaintiff has not met his burden to plead facts implying unfair dealing.[194]

Unlike in *Fidelity*, which concerned a committee awarding a purported benefit to a controlling stockholder, this case concerns directors awarding compensation to themselves. Delaware courts recognize that when directors exercise discretionary authority to set their own pay, they are necessarily interested and none of the procedural safeguards in an arm's-length transaction are present.[195] As a result, Delaware courts generally view the unfair dealing component to be effectively

---

[193] Defs.' Opening Br. 65-66.

[194] *Id.* at 66 n.269 (citing *Fidelity*, 2025 WL 1354973, at *7).

[195] *See Calma*, 114 A.3d at 578 ("This is not a case where disinterested directors approved the compensation of other directors; the Compensation Committee approved their own compensation and that of the other non-employee directors. Thus, in my view, Plaintiff has rebutted the presumptive business judgment standard of review.").

45

satisfied at the pleading stage for self-compensation claims.[196] This reality explains why the court in *Stein v. Blankfein* could acknowledge that the complaint was "silent as to unfair process" and still deny the motion to dismiss.[197]

As for unfair price, the plaintiff's allegations also meet his burden. He alleges that the directors' compensation consistently and significantly outpaced FNF's peer group while FNF underperformed.[198] In 2022, the directors' mean compensation was over 21% above the peer median, despite FNF ranking in the 35th, 45th, and 51st percentiles for market capitalization, income, and revenue, respectively.[199] In 2023, the directors' mean compensation rose to 38% above the peer median, while the Company's metrics allegedly dropped to the 33rd, 5th, and 37th percentiles.[200]

---

[196] *See Invs. Bancorp*, 177 A.3d at 1212, 1224-25; *Calma*, 114 A.3d at 589-90; *see also Manti Hldgs., LLC v. Carlyle Gp. Inc.,* 2022 WL 1815759, at *8 (Del. Ch. June 3, 2022) ("Because the entire fairness inquiry is fact-intensive, a determination that the entire fairness standard applies to a transaction 'normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss.'" (citation omitted)).

[197] *Stein*, 2019 WL 2323790, at *7-8.

[198] Compl. ¶¶ 38, 52, 59, 100, 101.

[199] *Id.* ¶¶ 32-40.

[200] *Id.* ¶¶ 42-52.

And in 2024, bolstered by the $100,000 special equity grants, the directors' mean compensation was allegedly 67% higher than the peer median.[201]

The defendants counter that the marginal increases from the 2021 baseline were routine and that setting salaries above a peer average is not evidence of excessive compensation.[202] They also emphasize that the compensation was appropriate because FNF vastly outperformed its peers in title operating margin, achieving an industry-leading adjusted pre-tax title margin of 15.1% in 2024 despite a difficult mortgage market.[203] These are persuasive points that may well pose a formidable barrier to the plaintiff's ultimate success and dampen expectations for a significant recovery. But they present a factual dispute inappropriate for resolution on a motion to dismiss.

At present, I cannot adopt the defendants' preferred performance metric (title operating margin) and ignore the plaintiff's identified metrics (market capitalization, revenue, and net income). By pleading that the directors' compensation rose to a large premium over the peer median while FNF lagged in key financial metrics, the plaintiff has pointed to "'some facts' implying lack of entire fairness."[204] The claim

---

[201] *Id.* ¶¶ 59-60, 100.

[202] Defs.' Opening Br. 67-68.

[203] *Id.* at 69; *see also id.* at 5, 19.

[204] *Stein*, 2019 WL 2323790, at *8 (quoting *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996)).

against the Compensation Committee members who fixed the compensation therefore survives.

b.     The Non-Compensation Committee Directors

Though the plaintiff's claim survives against the Compensation Committee members who approved the compensation, the same is not true for the directors who merely received it. "Delaware law . . . prescribes that a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's [or a committee's] decision to approve that transaction was wrongful."[205]

The Complaint acknowledges that the Compensation Committee—and not the Board as a whole—approved director compensation for 2022 to 2024.[206] The plaintiff does not allege that five directors (Ammerman, Rood, Shea, Dhanidina, and Morgan) played any role in the Compensation Committee's approval of the 2022,

---

[205] *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at *2 (Del. Ch. Mar. 9, 1995); *see also Citron v. E.I. du Pont de Nemours & Co.*, 584 A.2d 490, 499 (Del. Ch. 1990) (holding that "because the [directors] played no role in the Merger Committee's, or the Board's, decision[-]making process . . . plaintiff has failed to establish a factual or legal basis for a claim against [them]").

[206] *See* Compl. ¶¶ 35-37 (alleging that the Compensation Committee approved Foley's and the NEDs' 2022 compensation and "no Board meeting was required under the terms of the Incentive Plan"); *id.* ¶¶ 46-47 (alleging that the Compensation Committee approved Foley's and the NEDs' 2023 compensation, which was issued with no other alleged Board action); *id.* ¶¶ 59-60, 89 (alleging that the Compensation Committee approved the NEDs' 2024 compensation and awards with no allegation of further Board action); *see also* Defs.' Exs. 9, 13, 17.

48

2023, or 2024 compensation.[207] Foley played no role in approving his annual 2022, 2023, or 2024 compensation, and Miller had none in the 2024 package.[208]

To sustain a breach of fiduciary duty claim against passive recipients of compensation, a plaintiff must allege that they accepted the awards with awareness that the compensation was wrongful.[209] The Complaint lacks non-conclusory facts establishing that these directors accepted their annual compensation with the knowledge that it was improper or violated the Incentive Plan.[210] The breach of

---

[207] Compl. ¶¶ 16, 17, 21, 22, 23.

[208] *Id.* ¶¶ 20, 30-41, 42-53.

[209] *See Howland v. Kumar*, 2019 WL 2479738, at *4-5 (Del. Ch. June 13, 2019) (sustaining a claim where recipients accepted repriced options knowing of an impending, unannounced patent issuance); *Pfeiffer v. Leedle*, 2013 WL 5988416, at *10 (Del. Ch. Nov. 8, 2013) (sustaining a claim where the complaint supported a reasonable inference that a director accepted options in violation of a hard cap in the stock plan); *see also Knight v. Miller*, 2022 WL 1233370, at *12 (Del. Ch. Apr. 27, 2022) (applying *Kumar* and *Leedle* to hold that a plaintiff must plead a "knowingly wrongful acceptance of compensation" to support a bad faith claim).

[210] The plaintiff alleges that the 2024 special equity awards violated the forward-looking purpose of the Incentive Plan because they were for past performance in 2023. *See* Pl.'s Answering Br. 27-28. But even if that were true, it would not support a reasonable inference that the recipient directors accepted the awards with knowledge of a blatant violation of the Incentive Plan. *See Knight*, 2022 WL 1233370, at *12 (dismissing a similar claim for failure to allege "nonpublic facts known to the company and the Defendants that give rise to an inference of 'clearly improper' compensation" or any "allegation that the awards violated the Stock Incentive Plan [and] that the Defendants were aware of the same"); *see also supra* note 99. Again, the Complaint lacks any such allegations.

49

fiduciary duty claim is therefore dismissed against the directors for the compensation cycles in which they played no role in the approval process.[211]

### 2. Unjust Enrichment

Finally, the plaintiff claims that the director defendants were unjustly enriched by accepting their "excessive" 2022, 2023, and 2024 compensation.[212] The defendants seek dismissal of this theory as duplicative of the breach of fiduciary duty claim.[213]

Unjust enrichment is the "unjust retention of a benefit to the loss of another."[214] It requires: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; [and] (4) the absence of justification."[215] At the pleading stage, an unjust enrichment claim that is duplicative of a breach of fiduciary duty claim is often treated in the same manner.[216] The Complaint states a reasonably conceivable claim that the Compensation Committee

---

[211] *See supra* note 192 (summarizing the directors against whom the claim is dismissed and against whom it survives).

[212] Compl. ¶¶ 124-27.

[213] Defs.' Opening Br. 70.

[214] *Jackson Nat'l Life Ins. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (citation omitted).

[215] *Capano v. Ecofibre Ltd.*, 2025 WL 419494, at *1 (Del. Ch. Feb. 5, 2025) (citation omitted).

[216] *See, e.g.*, *Calma*, 114 A.3d at 591-92.

50

members breached their fiduciary duties by awarding unfair compensation.[217]   It follows that the plaintiff has stated a viable claim that the committee members were unjustly enriched by retaining those awards.

Although the breach of fiduciary duty claim is dismissed as to the directors who only passively received the compensation, restitutionary relief for unjust enrichment may still be available against a defendant who retains a benefit, even if they are not a wrongdoer.[218]   As Vice Chancellor Glasscock explained in *Knight v. Miller*, where a fiduciary duty claim survives against committee defendants who approved compensation awards, an unjust enrichment claim against the passive recipients is not "truly duplicative" and may proceed based on the reasonable inference that those defendants were "enriched, unjustly."[219]   That inference is supported by the Compensation Committee's alleged setting of the awards in an unfair manner, which impoverished FNF and enriched the passive recipients.[220]

The unjust enrichment claim therefore survives against all director defendants who received the challenged compensation.[221]

---

[217] *See supra* Section II.B.1.

[218] *See Schock v. Nash*, 732 A.2d 217, 232-33 (Del. 1999).

[219] *Knight*, 2022 WL 1233370, at *13.

[220] *See id.*

[221] The nine NEDs who received the challenged compensation and remain subject to the unjust enrichment claim are Ammerman, Dhanidina, Hagerty, Lane, Miller, Morgan,

## III. CONCLUSION

For these reasons, the defendants' motion to dismiss is granted in part and denied in part. The motion to dismiss the breach of fiduciary duty claim (Count I) regarding Foley's Equity Grant is granted under Rule 23.1 for failure to adequately plead demand futility. Under Rule 12(b)(6), the motion to dismiss the breach of fiduciary duty claim regarding the remaining challenged director compensation (Count I) is denied as to the Compensation Committee members who approved the challenged compensation and granted as to the director defendants who passively received the awards. Finally, the motion to dismiss the unjust enrichment claim (Count II) is granted as to Foley regarding the Equity Grant under Rule 23.1, but denied as to all director defendants (including Foley) who retained their compensation.

Rood, Shea, and Thompson. Foley also remains subject to the unjust enrichment claim related to his annual compensation for 2022, 2023, and 2024 (excluding the Equity Grant).